## STECKEL v. LURIE et al.
### No. 11115.

United States Court of Appeals
Sixth Circuit.
Nov. 17, 1950.

922

Frederick Bernays Wiener, Washington, D. C. (Joseph B. Keenan, Alvin O. West, Washington, D. C., and Sidney Rigelhaupt, Youngstown, Ohio, on the brief), for appellant.

James C. Davis, Cleveland, Ohio, (Squire, Sanders & Dempsey, and John Lansdale, Jr., all of Cleveland, Ohio, on the brief), for appellees.

Before SIMONS, McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellees brought an action against appellant in the district court for the recovery of attorneys' fees and expenses. The case was tried before the court, without a jury. Findings of fact, conclusions of law, and an opinion were filed, 79 F. Supp. 723, and judgment thereafter entered in favor of appellees. The issues presented on appeal are whether or not the findings of the district court are clearly erroneous, and whether the findings support the judgment. A further question is raised by appellant as to the power of Judge Wilkin, the district judge, to perform judicial duties in the case. It is claimed that, as a retired judge, he had no such power without a designation and assignment from the chief judge of the circuit; that he acted without

such assignment, and that his final orders in the case were, therefore, a nullity and wholly void. We proceed first to the consideration of the latter contention.

Judge Wilkin retired from judicial service under the provisions of the statute providing for retirement for disability.[1] It is provided by statute that any retired circuit judge or district judge may be designated and assigned by the chief judge or judicial council of the circuit, to perform such judicial duties within his circuit as he is willing to perform. Designation of such retired judge for service outside his circuit shall be made by the Chief Justice of the United States. No retired judge shall perform judicial duties except when designated and assigned. Title 28 U.S.C.A. § 294.

On October 3, 1949, by an order of Chief Judge Hicks, of the circuit, Judge Wilkin was designated and assigned to hold court in the United States District Court for the Northern District of Ohio, Eastern Division, to and including December 31, 1949; and the order of designation and assignment was filed in the office of the clerk of the Northern District of Ohio on October 5, 1949. A few hours after it was filed, it was endorsed by Judge Jones, chief judge of the district court, as "Withdrawn at request of Judge Wilkin. Oct. 5, 1949, 11:45 A. M. Jones, J." Judge Wilkin then filed, on October 12, 1949, during the course of the proceedings in this case, a memorandum opinion, 87 F.Supp. 702, in which he recited that a question had been raised as to his right and power to act as judge without a special designation, in view of his retirement, stating that the question arose from the wording of Title 28 U.S.C.A. § 294(d), which reads: "No retired justice or judge shall perform judicial duties except when designated and assigned." Judge Wilkin emphasized that the section of the statute "is a part of Chapter 13, which is entitled, 'Assignment Of Judges To Other Courts.' It has no applicability to the services of a judge in the court to which he was appointed." This interpretation would seem to qualify the rather plain language of the statute that no retired judge shall perform judicial duties except where designated, by reference to the chapter in which the section is placed, and by reason of the catch line used in the title. However, in Section 33 of the Act of June 25, 1948, c. 646, 62 Stat. 869, 28 U.S.C.A., Vol. 8, page 339, following section 2680, 1950 Ed., it is provided: "No inference of a legislative construction is to be drawn by reason of the chapter in Title 28, Judiciary and Judicial Procedure, as set out in section 1 of this Act, in which any section is placed, nor by reason of the catch-lines used in such title." We are constrained to hold, therefore, that the language of Title 28 U.S.C.A. § 294(d) is not subject to the construction that, because of the chapter title, it refers only to judges assigned to a court other than that to which they were appointed. According to its plain and unambiguous language, the section of the statute provides and means that no retired district judge shall perform judicial duties except when designated and assigned.

1. Title 28 U.S.C.A. § 372, provides:
 "*Retirement for disability*
 "Any justice or judge of the United States appointed to hold office during good behavior who becomes permanently disabled from performing his duties may retire from regular active service, and the President shall, by and with the advice and consent of the Senate, appoint a successor.
 "Any justice or judge of the United States desiring to retire under this section shall certify to the President his disability in writing.
 \* \* \* \* \* \*
 "A circuit or district judge, desiring to retire, shall furnish to the President a certificate of disability signed by the chief judge of his circuit.
 \* \* \* \* \* \*
 "Each justice or judge retiring under this section after serving ten years continuously or otherwise shall, during the remainder of his lifetime, receive the salary of the office. A justice or judge retiring under this section who has served less than ten years in all shall, during the remainder of his lifetime, receive one-half the salary of the office. [June 25, 1948, c. 646, 62 Stat. 903.] As amended May 24, 1949, c. 139, § 67, 63 Stat. 99."

924

In addition to the foregoing, however, Judge Wilkin stated, in his memorandum opinion, that although the statute provided that a judge who became permanently disabled might retire from regular active service, Congress recognized the fact that judges appointed for life during good behavior could not, under the Constitution, be removed from office except by impeachment or death. Further observing that Congress would have no power to depose such a judge or to limit his functions, Judge Wilkin declared that the commission of a United States judge is his grant of authority to perform all the duties of a judge of such a court; that under the statute, while a district judge may retire from regular active service, he still retains his office as judge; that such a retired judge acts with the full power of the authority vested in him by his commission with reference to such duties as he is willing to undertake; and that it is, therefore, unnecessary for a retired judge to have a designation to act in the court of which he is a member.

The statute relating to retirement of federal judges, and its provisions as to their designation and assignment to perform such judicial duties as they are willing to undertake, is not concerned with their removal or deposition, or deprivation of their compensation or of their office. It is, however, concerned with a limitation upon their functioning as judges under certain conditions. The statute has confided to the chief judge or the judicial council of the circuit the right to designate and assign retired judges to perform judicial duties. This does limit retired judges in the performance of such duties for, as said, it is provided that they shall not perform them unless so designated or assigned. A judge may be permanently disabled as far as regular active service goes, and still be able to perform some judicial duties from time to time. For such service, the statute makes provision by empowering the chief judge or judicial council of the circuit to designate and assign such a judge for limited service. But a judge may be permanently disabled, physically or mentally, so that he is not able to perform any judicial duties; and for that situation, the

statute also makes provision by prohibiting a judge from performing judicial duties except upon a designation by the chief judge or judicial council of the circuit. The statute thus grants to the chief judge or judicial council of the circuit the discretion of determining what judicial duties a retired judge may perform. These provisions of the statute do not seem unreasonable.

As to the constitutionality of provisions of an act of Congress limiting the functions of a district court or district judge, in Fisch et al. v. General Motors Corporation, 6 Cir., 169 F.2d 266, Judge Hicks, speaking for this court, observed that the district courts are not courts of general jurisdiction but that their jurisdiction is limited and their powers lie dormant until jurisdiction is conferred by the Congress under its constitutional authority, and that jurisdiction cannot be conferred in any other way.

"Only the jurisdiction of the Supreme Court is derived directly from the Constitution. Every other court created by the general government derives its jurisdiction wholly from the authority of Congress. That body may give, withhold or restrict such jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution. * * * The Constitution simply gives to the inferior courts the capacity to take jurisdiction in the enumerated cases, but it requires an act of Congress to confer it." Kline et al. v. Burke Construction Co., 260 U.S. 226, 234, 43 S.Ct. 79, 82, 67 L.Ed. 226.

"Congress, in its unlimited discretion, may constitutionally give, withhold, restrict or take away altogether the jurisdiction of the district courts of the United States. The lower federal courts do not derive their jurisdiction directly from Article III of the Constitution, U.S.C.A., but are created by and acquire their jurisdiction from Acts of Congress. * * * They are thus courts of limited jurisdiction and can exercise only such powers as Congress, within the limits of the Constitution, confers upon them. * * * It results that Congress, so long as it does not expand the jurisdiction

beyond that specified in Article III, may give, withhold, or take away jurisdiction." Seligman's, Inc. v. United States, D.C.La., 30 F.Supp. 895, 900.

It is clear that limitations upon the jurisdiction of a district judge by Act of Congress are not unconstitutional; and statutory limitations upon the performance of judicial duties by judges who have retired from regular active service because of permanent disability are not within any inhibitions of the Constitution.

■ Judge Wilkin, as has been said, was duly designated and assigned by the chief judge of the circuit to hold court during the period in which he acted in this case. He proceeded, however, under the theory that he did not require a designation and assignment, and requested the chief judge of the district to withdraw such designation, which was done. Appellant maintains that Judge Wilkin, as a retired judge, could not perform any judicial duties except upon a designation and assignment; and with this proposition, we have expressed our concurrence. But appellant further contends that since Judge Wilkin expressly disavowed the designation, purported to act by virtue of his original commission only, and caused the chief judge of the district court to withdraw the designation, he must be held to have acted without a designation and assignment.

Under the statute, the designation and assignment of a district judge for service within his circuit is made by the chief judge or the judicial council of the circuit. Title 28 U.S.C.A. § 294(b). The chief judge of the circuit is empowered to make any designations and assignments, in accordance with the provisions of the chapter of the Act relating to such assignments, and may revoke those previously made by him. Title 28 U.S.C.A. § 295. In this case, the designation, having been made by the chief judge of the circuit, was valid until its expiration or revocation. The only person who could revoke it was the chief judge of the circuit; and he did not do so. The withdrawal of the designation by the chief judge of the district court was without effect. The disavowal of the designation by Judge Wilkin was, likewise, of no effect. The only conditions required by the statute for the assignment of a retired district judge to active duty are that he be willing to undertake the judicial duties in question and that he be designated and assigned by the chief judge of the circuit. Judge Wilkin was willing to undertake and did undertake to perform the judicial duties in question. He was duly designated to do so, and he acted within the scope of his designation. The fulfillment of the foregoing conditions satisfied the statute and was sufficient to empower Judge Wilkin to perform the judicial duties in question, in accordance with the law.

We come, then, to the merits of the controversy. The facts in the case are, for the most part, set forth in a written stipulation between the parties that covers seventy-four printed pages in the transcript. From the stipulation, it appears that Steckel, prior to 1923, had invented methods, processes, and apparatus for rolling metals, which resulted in a revolutionary change in the entire metal industry. In 1926, in order to exploit Steckel's patents, The Cold Metal Process Company was incorporated, and the patents assigned to it; and for his assignment, Steckel received 30% of the total amount of the common stock of the company. Many important corporations in the metal working industry recognized the great commercial value and advantage of the patents, but refused to recognize their validity, and, as a consequence, subsidiaries of the United States Steel Corporation, Bethlehem Steel Company, Republic Steel Corporation, and others were making widespread use of what Steckel had invented, but were refusing to pay compensation for the use of the patents. Some users were paying compensation at varying rates, and on different bases, to The Cold Metal Process Company, and as to others, the company was engaged in litigation in which the validity of the patents was attacked. By the end of 1934, Steckel, who had for seven years served as president of the company and then owned 29% of its voting stock, had been involuntarily removed as an officer

by his fellow directors, and had all his compensation from the company immediately cut off. His relation to the company was then that of a minority stockholder and director, against whom the other five directors of the company were aligned; and the company was suing him for an alleged indebtedness to it in an amount in excess of $25,000. He had become involved in sharp and bitter personal disagreements with the majority of the board of directors of The Cold Metal Process Company. The company's own financial structure was in jeopardy. Steckel had discovered that in April, 1933, the company was in debt to the extent of about $1,000,000, and he learned later that it was indebted to a still greater extent. The assets on hand of the company were not sufficient to liquidate such debt at that time.

At that time, Steckel was between fifty and sixty years of age, a widower, and living in a rented house in Youngstown with his sister and minor daughter, for both of whose support he was responsible. He had no assets or source of income other than his 580 shares of common stock. He was unemployed; had been removed as an officer of the company, and had been cut off its payroll by the other directors, who he believed were in the process of looting the company. He had been able to maintain himself, his sister, and his daughter during the period immediately preceding the end of 1934 only from the proceeds of the sale of a home owned by his sister. He testified that he was then engaged in a murderous warfare in which he was trying to save everything he had, and all that he had was the 580 shares of common stock. In the first part of 1934, a suit had been started against him by the company to recover approximately $25,000 in alleged advances and a judgment had been entered against him in the suit for $18,000. He had also been sued for a refrigerator bill, as well as for his rent, and, as he said, "for anything in this war the enemy could bring up." He had no money to pay any lawyer to protect his interests. He was penniless.

All of the stock owned by the other five members of the board of directors had been pledged to secure bank loans which had not been paid at maturity, and a bankers' committee was, for practical purposes, in charge of the company's affairs. At the same time, a suit for the appointment of a receiver of the company was pending in the United States District Court for the Northern District of Ohio. The several suits for the recovery of money against Steckel personally which were pending in the Common Pleas Court of Mahoning County, Ohio, also placed Steckel's stock interests in The Cold Metal Process Company in jeopardy. During this same year, 1934, Steckel met appellee, Reuben L. Lurie, an attorney from Boston, who happened to be in Youngstown, Ohio, visiting his brother who was a close personal friend of Steckel. At this time, Steckel outlined to Lurie the difficulties with which he was confronted and his desire to employ new attorneys to protect his interests. Lurie, however, advised Steckel that he should make every effort to obtain the employment of counsel resident in Ohio, and pointed out to him the difficulties which would confront both Steckel and nonresident counsel. However, from June, 1934, until January, 1935, Steckel continued to exchange views with Lurie with respect to his problems, and on January 31, 1935, Steckel employed Lurie and Abraham T. Alper, also of Boston, to represent him in the case then pending in the United States District Court for the Northern District of Ohio, in which Steckel and the other directors of The Cold Metal Process Company were defendants. This was a suit which had been brought by a minority stockholder of the company to enjoin action by its board of directors and to have a receiver appointed to conduct its business. At the time of the employment by Steckel of the appellees to represent his interest in this case, he told them that he would require their assistance in connection with his other problems. Steckel informed them that the fruits of his life work were represented in the value which could be established for his stock ownership in The Cold Metal Process Company, and he represented that his interest would be worth several million dollars if he could retain his own stock interest to the full extent. He further

represented that in order to accomplish this end, money judgments against him should be avoided as far as possible, or deferred until the true value of his stock could be better determined; and that the company's own financial integrity should be maintained, as far as possible, and the majority directors should be prevented from wasting its assets, including its patent rights. Steckel's fears were that he would either lose his own stock interest through litigation against him, or that the corporate assets of the company would be wastefully diverted from its stockholders to the advantage of the personal interests of its dominant directors. He further advised Lurie and Alper that he was and would be unable to compensate them for their services on a definite and assured basis, but that their compensation would have to be contingent upon the reasonable value of the services rendered to him and upon his ability to pay, as represented by, and based upon, the extent to which he could retain his stock against the attacks being made against him, and upon the value which the stock developed. He described his problem and difficulty as a murderous war in which his enemies sought to get his stock away from him, and he tried to keep them from wasting the company's assets—a war on all fronts against his enemies who sought his ruination.

As a result of these conferences and Steckel's representations, Lurie and Alper agreed to represent him in the so-called war, and to render such services as his interests might require, upon the contingent basis of payment of compensation as above outlined. They agreed to give Steckel's business first call on their time, and further agreed that one or the other of them would spend such time in Ohio as the protection of Steckel's interests might require. It was recognized by both appellees and appellant that the protection of Steckel's interests would require substantial cash disbursements to defray the expenses which Lurie and Alper incurred, and the living expenses of Steckel and his family. Steckel thereupon agreed to attempt to raise approximately $20,000, or such sum as might be necessary to meet

his own expenses, and currently to pay the necessary expenses of Lurie and Alper; but he never paid their expenses.

In June, 1938, Steckel determined to sell 160 shares of his stock for $56,000 because, as he said, there was nothing else he could do about it. He testified: "I was desperately poor, would do anything to get a dime, couldn't do anything else. I mean the enemies' plan had finally succeeded; they starved me out and I finally had to take it." In October, 1938, appellees suggested that Steckel pay the expenses which had been advanced by them on his behalf, and make some more definite arrangement about the fees. He replied that the $56,000 he received might be the only cash that he would ever receive on account of his stock ownership in the company, in which event it would represent all that he would get for most of his life's work; that he was a much older man than either of the appellees; that, therefore, he felt he should not be asked to give up to them any part of the $56,000 even to reimburse their expenses. He told them further that if appellees would not press him at that time for their expenses or for any compensation, but would go along with him in the war, he would assure them they would be liberally compensated, both for past and future work, if they won. He was not very optimistic at that time that his stock would pay out. Furthermore, appellant stated that he was "dead broke" in October, 1938, at the time of this conversation. He stated that his local lawyer had attached $10,000 of the $56,000 for legal fees, and had enforced payment by such procedure.

In carrying out their agreement and in representing appellant's interests, appellees rendered legal services from the first part of 1935 for six years. They also secured the services of an outstanding and expert trial lawyer, Lee M. Friedman, of Boston, who took part in considerable complicated and hotly contested litigation, and who, during that time, counseled and advised with Steckel for a number of years. During the time in which appellees acted as attorneys for Steckel, they and Friedman devoted more than 1539 days to his interests. This time was devoted not only to legal

services in the strict sense of that term, but included other services in connection with the internal management of the company, as well as efforts to obtain financing for Steckel, and efforts to compose the controversies in which he was involved. In addition, appellees advanced money for Steckel's expenses in connection with their representation of his interests in the amount of $6,031.80.

Appellees and their associate, Friedman, during a period of more than six years, rendered legal services to Steckel of the most difficult and arduous nature in complicated corporate transactions and protracted and complex litigation, with the object of protecting Steckel's stock interest, and its value, and involving, to him, the difference between penniless poverty and a great fortune. At the time Steckel employed appellees as his lawyers, his stock had no market value whatever. At the conclusion of their services, Steckel's stock interests in The Cold Metal Process Company had developed a total value of well in excess of $1,000,000, according to the findings of the trial court. Appellant's own estimate of the value which his stock developed exceeded $6,000,000. Appellant never paid appellees or Friedman anything whatever for the services rendered to him. He claimed that he had tried to discharge them as his legal counsel, and because of their refusal to follow his instructions and surrender certain documents to him, he was relieved of any liability. Moreover, of the $6,031.80 which was advanced by his lawyers to take care of necessary legal expenses on his behalf during the six year period, Steckel did not repay any amount whatever.

During his association with appellees and Friedman, Steckel proved to be an irascible individual who abused practically everybody concerned with his troubles, and indulged in vitriolic language toward those who disagreed with him. He insisted upon charges of fraud and rascality being made against the lawyers for the other members of the company. His own lawyer, Alper, stated that Steckel was even abusive of him during his efforts to help him. As to Friedman, Steckel had importuned him to come to Ohio to try the so-called federal case, and when Friedman informed him of the great difficulties for him, because of his many other engagements and commitments in Boston, Steckel persuaded him to come, saying that the case could probably be tried in a week. Friedman acceded to his wishes; and the trial of the case consumed fifty days. After this service on his behalf, Steckel repeatedly accused Friedman of bad faith and of working in the interest of everybody but his own client, and further charged that Friedman was trying to slide in and take his place in the company. He declared that he was convinced that Friedman was "dangerous and working for the enemy instead of for me." It is sufficient here to say that the record is absolutely devoid of any trace of evidence that would support such charges. On the contrary, the court found that the legal services rendered to Steckel were remarkable for patience and devotion to a client's cause. Friedman testified on the trial that Steckel wanted him to attack the honesty, decency, morals, and family life of everybody that he was opposed to; and Friedman refused to do this. The result was that Steckel berated him "for fighting a war with feather dusters." As an instance of the way in which Steckel characterized his opponents, he wrote letters about a lawyer to whom he was hostile, saying that he called him a rat when he wanted to flatter him. In a suit in Mahoning County, Steckel disqualified every judge in the county except Judge Lyon, and he demanded that his lawyers ask for his disqualification on the ground of prejudice. Although they advised strongly against such proceedings, they filed them because of Steckel's insistence, with the result that the Chief Justice of the Supreme Court of Ohio found that Judge Lyon was in no manner disqualified to sit in the case. In addition, Steckel insisted upon Friedman's attacking an attorney on the basis of rumor and sought to have disbarment proceedings brought against him. He demanded that in such proceedings, his attorneys file charges of fraud against the lawyer, although he conceded that there was no proof to sustain the charge. During

the trial of this case, in belittling appellees, Steckel represented that his local counsel was of much more assistance to him in all of these proceedings than were the appellees and Friedman. However, upon being confronted with letters previously written by him, he was forced to admit that he had told appellees in 1935 that his local counsel "has no vision beyond some small immediate objective, and is otherwise not to be thought of for the main fight before a Federal court"; that he "could be useful for filling in details with which he is familiar but he is cursed with his preoccupation with a multitude of affairs principally in little pettifogging issues, which has caused me to be badly served at various times and I have encountered too much of that already"; and on December 12, 1935, Steckel further wrote appellees that his main concern was to get them immediately into a position where his local lawyer "cannot sell me out to * * * Powers, which has sometimes left me high and dry." When this local lawyer was pressing for his fees and threatening to sue him, Steckel wrote appellees and expressed his appreciation of the fact that they did not strike him in that, his most vital spot.

Having assured appellees, in 1938, that if they would not press him for payment of expenses or compensation at that time, and would go along with him in the "war," he would assure them that they would be liberally compensated for past and future work, it is Steckel's claim at the present time that he is not indebted to appellees or Friedman for any legal services rendered, or for any amounts which they advanced on his behalf.

The district court found, as was admitted by Steckel, that he had employed appellees to represent him in various litigation and to render other services directed at preserving and enhancing his stock interest in the company; that both parties had agreed that appellees' compensation would be contingent upon the reasonable value of their services, and upon the appellant's ability to pay, as represented by and based on the extent to which he could retain his stock against attacks being made upon him, and the value which the stock developed; that by virtue of such employment, appellees also provided as a part of their services, the services of Lee M. Friedman. As the court observed, when Steckel employed appellees, "His affairs were intensely complicated and his condition often seemed desperate. But if he could retain his stock holdings until the patents were sustained, his fortune would be secure." The court further found that during the period of their employment, appellees and Friedman devoted, in rendering professional services on behalf of Steckel, a total of 1,539¼ days, 952½ of which days were in Boston, and 586¾ [2] of which days were outside of Boston, and of which days in Boston, 217¼ were days devoted by Friedman in rendering services for appellant, and of which days outside of Boston, 83½ were days devoted by Friedman to rendering services for appellant. The court further found that during their employment by appellant, appellees had advanced expenses in connection with their representation of his interests in the amount of $6,031.80, which expenses were reasonably necessary to be incurred in connection with the representation by appellees of appellant's interests, and that no part of that amount had been paid by appellant. Moreover, the court found that at the time of the employment of appellees, appellant's stock in The Cold Metal Process Company was without any market value, and that at the termination of the employment, such stock was of the value of at least $4,000 per share, and of an aggregate value substantially in excess of $1,000,000. All of the foregoing facts, as found by the court, were facts which were admitted by the appellant.

The court, in its conclusions of law, accordingly held that appellees were entitled to the fair and reasonable value of their services and of the services rendered by Friedman, together with the expenses ad-

**2.** An apparent misprint in the court's findings of fact in the transcript indicates this figure as 536¾ instead of 586¾.

The stipulation between the parties, however, states this figure to be 586¾, and it is so conceded in the briefs.

vanced by them, and that under all of the circumstances of the case, the fair and reasonable value of such services was $153,-925.00, and the amount of expenses advanced, together with interest, aggregated $8,738.07, upon which judgment was entered in favor of appellees and against appellant in the amount of $162,663.07.

Appellant claims that he dismissed appellees from his service during the course of their representation of his interests; that on their dismissal, they wrongfully refused to surrender to appellant the transcript of prior proceedings, on his request; refused to state the amount of their charges; and refused appellant's proffer of part payment. For these reasons, appellant insists that appellees are not entitled to a "substantial" recovery for their services. Appellant further contends that the trial court erred in its determination of the fair and reasonable value of appellees' services, and that the compensation awarded was excessive in view of the results obtained.

 The present claim of appellant that he had discharged appellees as his attorneys is based upon an incident in one of the cases involving The Cold Metal Process Company in the district court, referred to as the "Federal Case." That suit had been brought by a nominal plaintiff, inspired by appellant, seeking to obtain a receiver for the company. Hearings before a special master continued for a period of fifty-one days. The record exceeded 3,500 pages in length, in addition to 300 exhibits. Prior to the filing of the master's report, exhaustive briefs were filed by both parties, and there were three days of oral argument before the master. Thereafter, the master filed his report, consisting of 191 pages, containing 186 findings of fact and 24 conclusions of law. On July 30, 1937, the day on which the report was filed, appellant informed appellees that no delay beyond the regular twenty days should be obtained in which to file exceptions, but that the report "would have to be attacked boldly and openly as a brazenly prejudiced report, * * * by a few proofs of prejudice, I

do not mean mere bias, which might be unconscious bias, but down-right crooked procedure consciously designed to protect Beeghly where proofs of his guilt are plain." Steckel went on:

"As to asking for any time, beyond twenty days, to file exceptions, my best thought is that you learn from Hughes immediately whether or not he intends to ask for more time, and that you yourselves do not ask for time if he does not.

"After all that was suffered from Huey's evident prejudice, of which Mr. Friedman made recorded complaint long ago, I have to insist that you do not at this late day pretend to have forgotten all that, and proceed just as though we were dealing with an honest Master."

Appellees, in order to protect appellant's rights, disregarded appellant's letter that they attack the report solely on the grounds of his claim that the master was corrupt, and obtained an extension of time for the purpose of filing exceptions to the report; and many of the exceptions so filed were later sustained by the district court on final submission. When appellant learned of their action, he wired them that he was putting the matter of the preparation of exceptions and briefs into the hands of another attorney, and asked appellees to send the entire record of the case to him forthwith. Appellees refused to send on the record on this request, and informed appellant that unless he was prepared to discharge the obligations owed them, they would continue with the preparation of the exceptions and brief; and they further informed him that they knew that because of his circumstances, he could not discharge his obligation to them. Appellant replied by again requesting the record, stating that their dismissal from the "federal case" was deliberate and unconditional. Other letters followed between the parties, largely to the same effect. Appellant offered so-called certificates of participation in 15 shares of his stock, together with a dividend, as full payment, or payment on account. But, as the trial court found, appellees had the right to decline this offer, on any theory, inasmuch as it was not an offer of cash

or the equivalent of cash. On February 19, 1938, Steckel sent a telegram to appellees stating that he forbade oral appearance by them or Friedman on his behalf in Cleveland on the so-called federal case, and asked them to withdraw voluntarily from that case. In reply, appellee Lurie wrote Steckel, saying that they would not withdraw unless Steckel was prepared to pay for their services, that appellees had loyally protected all of his rights, and that he hoped to come to Youngstown in the near future to see Steckel in order to iron out the whole situation. The result was that Lurie went to Youngstown, saw Steckel, reassured him about the litigation in question and other matters, and Steckel then changed his mind about appellees' representation of his interest in the "federal case," as evidenced by a letter written by Steckel to appellee Lurie on February 26, to the following effect:

"Dear Lurie:

"This is to express:—

"(1) my personal gratitude to you for having come all the way to Youngstown to discuss all our mutual affairs to date instead of my having to travel at all just now to meet you, as had been my intention—

"(2) my personal relief after candid discussion of matters in which we had drifted too far apart as a result of the too long distance between Boston and Youngstown—

"(3) my belief that this conference will result in best cooperation between us in all the future—

"(4) my surprise at seeming to have been misunderstood to desire withdrawal of Lurie and Alper or of Friedman from Option Case or of L. and A. from Advances Case,—neither of these thoughts having been thoughts of mine—

"(5) my desire to have all of you remain connected with Federal Case under mutual understanding between us (you and me, Lurie and Steckel) as to what each side (Boston and Youngstown) shall not do independently of the other."

At no time did Steckel ever attempt to discharge or dismiss appellees as his attorneys. The most that he purported to do was to dismiss them from further proceedings in one case out of several in which they were engaged; and his agreement with appellees from the inception of their relationship was that they would represent him in many more matters than merely litigation. As to the case in which he attempted to discharge them from preparation of exceptions and brief, such attempted dismissal was withdrawn by Steckel as soon as the parties had a personal interview in the matter; and appellees thereafter continued to represent him as they had in the past. We find no merit in the claim that appellees were discharged by Steckel as his attorneys; that they wrongfully continued to represent him; and that, because of such discharge and their conduct, they forfeited any right to compensation for the services they performed on behalf of Steckel up to that time, and subsequently.

On the question of the fair and reasonable value of appellees' services, the court observed that appellees assumed a great hazard in representing Steckel on a contingent fee basis. As heretofore mentioned, the agreement between the parties was that appellees' compensation was to be contingent upon the reasonable value of the services rendered, based upon Steckel's ability to pay as represented by and based upon the extent to which he could retain his stock against the attacks made upon him and the value which the stock would develop. It was stipulated that the basic purpose that appellant desired appellees to achieve was "that Steckel should be able to retain, to the full extent his legal rights would permit, his own stock interest, and that, to this end, money judgments against him, to the extent possible, should be avoided or deferred" as far as possible, and the "majority directors prevented from wasting its assets, including its patent rights." It was further agreed between the parties that "Steckel's employment of Lurie and Alper would be: (1) To represent him in any litigation involving The Cold Metal Process

Company or his stock interest therein, and (2) To perform any other services for him which were not a part of litigation, but directed at preserving and enhancing his stock interest in the company." In determining the value of appellees' services, the trial court took into consideration the facts and circumstances agreed to in the stipulation, the contract of employment on a contingent fee basis, the nature of the duties agreed to be performed, the fact that appellant's stock was without value at the time of appellees' employment and was worth considerably more than $1,000,000 at its conclusion, the evidence, the correspondence, the age and experience of appellees, the time spent, the service rendered, and the amount paid to other counsel for similar services. In arriving at its judgment of $153,925.00, the court obviously considered that the fair and reasonable value of appellees' services under their contract and in view of all of the circumstances of the case, was $100 a day for 1,539¼ days. Steckel had paid his local counsel $100 a day for the same services that were rendered by Friedman or the appellees during the litigation. He also paid more than $23,000 to another firm to represent him for one year out of the six during which appellees represented him. Payment of the fees to this firm and to his local attorney were on a regular basis for services performed, rather than on a contingent fee basis. Two of the leading lawyers of the Ohio Bar were sworn as experts and gave as their considered opinion that the value of the services rendered by appellees was twice as much as that found by the district court.

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The findings in this case were not clearly erroneous. The judgment was amply supported by the findings of fact and by the evidence. We find no error in the denial of a new trial; and other matters discussed in the briefs are unnecessary to decision.

In accordance with the foregoing, the judgment of the district court is affirmed.